Laurence **DELAFOSE** et al.

v.

John R. **MANSON**, Individually and as Commissioner of Correction of the State of Connecticut, et al.

Civ. No. H–74–135.

United States District Court, D. Connecticut.

Dec. 6, 1974.

Michael Churgin, Dennis E. Curtis, Stephen Wizner, New Haven, Conn., for plaintiffs.

Stephen Wizner, Ann F. Thomas, Law Student, New Haven, Conn., for plaintiffs.

## RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

BLUMENFELD, District Judge.

Plaintiffs are convicted felons, sentenced to a period of incarceration in one of the correctional institutions under the jurisdiction of the Connecticut Department of Correction and subsequently transferred to the Whiting Forensic Institute in Middletown, Connecticut (hereinafter referred to as "Whiting") upon a determination that they were in need of treatment for mental illness. They complain that while incarcerated at Whiting they do not receive the 38 cents-per-day "hospital pay" which inmates at correctional institutions receive when hospitalized for treatment of physical ailments in correctional institutional hospitals or outside private hospitals. They allege that this disparity violates their right to equal protection of the law pursuant to the fourteenth amendment and 42 U.S.C. § 1983 (1970). Jurisdiction is grounded upon 28 U.S.C. § 1343(3) (1970).

The plaintiffs seek class certification of this action pursuant to Fed.R. Civ.P. 23 with the class defined as all "persons convicted under the Connecticut Penal Code and sentenced to imprisonment in Connecticut Correctional Institutions from which they have been transferred to the Whiting Forensic Institute in Middletown, Connecticut, a mental health facility of the Department of Mental Health." As all the requirements of Fed.R.Civ.P. 23(a) and (b)(2) have been satisfied, the class is certified as defined above.

Both parties have moved for summary judgment and have submitted affidavits in support of their respective motions. These affidavits reveal the following undisputed facts. Pursuant to Conn.Gen. Stat.Ann. § 18–85 (Supp.1974) [1] the Department of Correction has established a pay-incentive program which provides hourly wages on a graduated scale to inmates for labor performed at the correctional institutions. Under this program, inmates who are physically ill and require treatment in an institutional hos-

1. Conn.Gen.Stat.Ann. § 18–85 provides:
"The commissioner, after consultation with the council and the personnel policy board, shall establish a schedule of compensation for services performed on behalf of the state by inmates of any institution or facility of the department. Such schedule shall recognize degrees of merit, diligence and skill in order to encourage inmate incentive and industry. Sums so earned shall be deposited, under the direction of the administrative head of such institution or facility, in a savings bank or state bank and trust company in this state, and shall be paid to the inmate on his discharge; but the warden, superintendent or jail administrator may, while the inmate is in custody, pay to the inmate or to his spouse, parent or parents or children such portion of such compensation as is necessary for the welfare of the inmate or such relatives or may pay to the clerk of the court in which a jail inmate, held only for payment of a fine, was convicted, such portion of such compensation as is necessary to pay such fine. Any interest that accrues shall be credited to any institutional fund established for the welfare of inmates. Compensation under this section shall be in addition to any compensation received or credited under section 18–50."

pital or outside hospital facility receive a flat 38 cents-per-day as "hospital pay." This pay comes out of the budget of the correctional institution to which the inmate is assigned. On the other hand, inmates who are transferred to state-operated mental health institutions are not included within the pay-incentive program and receive no "hospital pay."

All three named plaintiffs were transferred to the Whiting Forensic Institute from institutions within the state correctional system pursuant to Conn. Gen.Stat.Ann. § 17–194a (Supp.1974).[2] Whiting is administered by and is under the jurisdiction of the Connecticut Department of Mental Health which operates on a separate budget from the Department of Correction. While at Whiting a prisoner's maintenance, supervision and program is undertaken and developed by the Department of Mental Health. In addition, upon leaving the correctional institution in which he was incarcerated, the inmate is "taken off the count," Affidavit of John R. Manson ¶ 5, of that institution, his account is closed and all personal belongings are sent with him to Whiting.

On the other hand, all inmates transferred to Whiting remain under the initial mittimus committing them to the Commissioner of Correction following their conviction of a crime. While at Whiting the inmate continues to earn good time credits and the correctional institution from which he was transferred maintains his time records. He remains eligible for parole consideration. Likewise, he may appear before the Pardons Board and does so by submitting a request to the staff of the correctional institution from which he was transferred. In addition, should the transferred inmate "recover his reason" before the expiration of his sentence, he is

2. Conn.Gen.Stat.Ann. § 17–194a provides:
"When, in the opinion of the commissioner of correction or the superintendent of the Connecticut School for Boys, any person confined under sentence of any court in any institution of the department of correction or in such school or held in jail pending disposition of his arrest has become mentally ill or appears to be mentally ill, said commissioner or superintendent shall, immediately, cause such person to be examined by a physician. If it appears from such examination that such person is mentally ill, the commissioner or superintendent, as the case may be, may, upon receipt of the certification of such physician and with the concurrence of the superintendent of such state hospital, transfer such person to a state hospital for the mentally ill, there to be safely kept until the expiration of the term for which such person was committed to such correctional institution or until the disposition of his arrest, or until such person has recovered his sanity. At the time of such transfer, such physician shall present to the superintendent of such hospital a certificate to the effect that, in his opinion, such person is mentally ill and in need of hospital treatment. If the commissioner of correction is of the opinion that any inmate of the State Prison so found to be mentally ill is a desperate or dangerous individual and that his transfer to or continued confinement in a hospital for the mentally ill would not be in the interests of the safety of the public, he may order such prisoner detained within or returned to the State Prison and there confined under appropriate care and supervision. If, before the expiration of the term for which such person was sentenced, or before the disposition of his arrest, as the case may be, such person, in the opinion of the superintendent of such hospital, has recovered his reason, such superintendent shall forthwith report the fact to the commissioner of correction or the superintendent of the Connecticut School for Boys, as the case may be, who shall cause such person to be transferred from such hospital and delivered to the proper authorities of the particular institution to which he had been sentenced or in which he was confined. This section shall terminate on certification by the mental health commissioner to the secretary of the state as required by section 17–257."

This statute was declared unconstitutional in Chesney v. Adams, 377 F.Supp. 887 (D. Conn.1974). The court held that inmates transferred to Connecticut mental institutions pursuant to this statute were denied equal protection because nonincarcerated individuals could only be civilly committed pursuant to Conn.Gen.Stat.Ann. § 17–178 (Supp.1974) which provides many more procedural safeguards. The transfer of the named plaintiffs occurred before the decision in *Chesney*, but there is no contention in this action that they are being illegally detained at Whiting.

transferred back to the institution in which he had been originally confined. Conn.Gen.Stat.Ann. § 17–194a (Supp. 1974).[3] Finally, Dr. David Hedburg, Director of Psychiatric Services for the Connecticut Department of Correction and Mrs. Wadley, a registered nurse at the Connecticut Correctional Institution at Cheshire, attend monthly clinical review sessions at Whiting at which the cases of inmates transferred from correctional institutions are discussed. Dr. Hedburg functions as a consultant at those meetings with control of the inmates' treatment programs left in the hands of the Whiting staff.

The affidavits further reveal that while an inmate is receiving treatment at an institutional hospital or outside hospital facility for physical illness, all of his maintenance, supervision and program is provided by the Department of Correction which retains full control over him. Only his medical treatment is left to the discretion of outside medical personnel.

The plaintiffs argue that the policy of denying them "hospital pay" while providing it to inmates receiving medical treatment in institutional or outside hospital facilities denies to them the equal protection of the law. In so arguing, they invoke as the standard by which the constitutionality of this discrimination is to be judged the one set out in McGinnis v. Royster, 410 U.S. 263, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973). In that case, the Supreme Court considered the constitutionality of a New York statute which denied good time credit for presentence incarceration in county jails. The Court applied a minimal standard of review:

"We note further that the distinction of which appellees complain arose in the course of the State's sensitive and difficult effort to encourage for its prisoners constructive future citizenship while avoiding the danger of releasing them prematurely upon socie-

ty. The determination of an optimal time for parole eligibility elicited multiple legislative classifications and groupings, which the court below rightly concluded require only some rational basis to sustain them. James v. Strange, 407 U.S. 128, 140, 92 S.Ct. 2027, 2034, 32 L.Ed.2d 600 (1972); Lindsey v. Normet, 405 U.S. 56, 73–74, 92 S.Ct. 862, 874–875, 31 L.Ed.2d 36 (1972); Schilb v. Kuebel, 404 U.S. 357, 92 S.Ct. 479, 30 L.Ed.2d 502 (1971); Dandridge v. Williams, 397 U.S. 471, 487, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1969). Appellees themselves recognize this to be the appropriate standard. For this Court has observed that '[t]he problems of government are practical ones and may justify, if they do not require, rough accommodations,—illogical, it may be, and unscientific.' Metropolis Theatre Co. v. City of Chicago, 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730 (1913). We do not wish to inhibit state experimental classifications in a practical and troublesome area, but inquire only whether the challenged distinction rationally furthers some legitimate, articulated state purpose." 410 U.S. at 269–270, 93 S.Ct. at 1059. (Footnote omitted.)

In upholding the statute the Court found that the policy of denying good time credit for pretrial incarceration was rationally consistent with the articulated statutory purpose of using good time to promote inmate rehabilitation. As no rehabilitative programs were available in pretrial facilities, the statutory purpose would not be served by awarding good time credit for time spent in such facilities.

The plaintiffs persuasively argue that the discrimination involved in the instant case fails to satisfy even the minimal standards of rationality. The only *articulated* purpose of the pay incentive program authorized by Conn.Gen.Stat. Ann. § 18–85 is "to encourage inmate

---

3. The constitutionality of this retransfer provision of § 17–194a was not at issue in Chesney v. Adams, *supra.*

incentive and industry." It is difficult to understand how that purpose is rationally furthered by providing "hospital pay" to those who are hospitalized for treatment of physical illness while denying it to those who are hospitalized for the treatment of mental illness.

Indeed, in an analogous context, Judge Newman in McAuliffe v. Carlson, 377 F.Supp. 896 (D.Conn.1974) recently invalidated, *inter alia,* a state practice of seeking reimbursement for the cost of mental treatment at state facilities from inmates transferred to such institutions from Community Correctional Institutions, while not seeking such reimbursement from those provided hospital treatment for physical illness. Judge Newman reasoned:

> "It may well be that in some instances the costs of mental illness hospitalization exceed the costs of hospitalization for other illnesses, but there has been no demonstration that this is true generally, or for the class of transferred prisoners in particular. The State has not attempted to categorize the costs to be charged by reference to a minimum hospital stay or a minimum dollar amount. It has simply selected mental illness out of all the conditions that may require hospitalization and imposed on one class of prisoners a charge for such care. There is no basis for concluding that this classification of costs rationally furthers a legitimate state interest." *Id.* at 903–904.

Similarly, in the instant case, the defendants have chosen to completely exclude from the benefits of the pay-incentive program those who are transferred to Whiting while continuing to provide benefits to those who are receiving hospital treatment for physical illness. While it *might* be rationally related to the purpose of the statute to restrict "hospital pay" to those who are able to return to work after a relatively short period of hospital confinement, no effort has been made to do that here. The state does not attempt to argue that all those transferred to Whiting will remain incapable of performing work at their home institutions for a period longer than all those receiving medical treatment in institutional or outside hospital facilities. Clearly, an inmate who suffers a severe heart attack could require more prolonged hospitalization than one who is transferred to Whiting for treatment of a mental illness, perhaps acute, rather than chronic, in nature.

The defendants contend that it is reasonable to deny "hospital pay" to those transferred to Whiting because, while at that institution, an inmate's maintenance, supervision and program is the responsibility of the Department of Mental Health, whereas the Department of Correction retains reponsibility for inmates receiving treatment in institutional or outside hospital facilities. Once at Whiting, they argue, an inmate is essentially under the jurisdiction and control of another department of the state with different policies, programs and a different budget from those of the Department of Correction. It would be unreasonable, they maintain, to require cross-jurisdictional equality.

In support of this argument, they cite this court's opinion in Beatham v. Manson, 369 F.Supp. 783 (D.Conn.1973) which in turn followed McGinnis v. Royster, *supra.* In *Beatham* this court was faced with a challenge to another alleged disparity in the state pay-incentive program for prison inmates. The plaintiff had been compensated at a rate of 59 cents-per-day while at Somers, but his wages were reduced to 38 cents-per-day upon being transferred to Enfield. It was unconstitutional, he argued, for the state to pay more to Enfield inmates who had earned high rank in the Enfield pay scale than was paid to transferees to Enfield who had equally high rank in the Somers pay scale.

This court rejected the plaintiff's claim. Recognizing the great latitude which must be afforded state officials in seeking to further the statutory purpose of § 18–85, this court held that it was reasonble to reduce the salary of transferees because of the great difficulty in-

volved in trying to integrate them into an existing job and wage structure at a different institution. Emphasis was placed on the fact that the generally more desirable environment of Enfield could be "deemed to compensate transferees for any loss of pay scale rank, making it preferable to impose the risk of loss of rank or seniority on transferees rather than on continuing inmates at Enfield." 369 F.Supp. at 789.

Secondly, this court noted that even though the disparity could be eliminated without displacing the continuing Enfield inmates by increasing or reallocating the budget for the pay-incentive program, the state would not be required to do so, stating,

"It rationally serves the purpose of the compensation program while accommodating budgetary considerations to establish a pay scale system involving a fixed number of positions at each specified rank, and to assign transferees only to such positions as are open, rather than to inject uncertainty into the overall cost of the compensation program by tailoring each transferee's pay scale rank to his former rank at Somers. To paraphrase the Supreme Court, the Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited prisoner compensation funds among the myriad of potential recipients. See Dandridge v. Williams, 397 U.S. 471, 487, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)." 369 F.Supp. at. 789.

*A fortiori,* the defendants argue, if such a pay differential experienced by prisoners transferred within the correctional system is constitutional, then a differential across jurisdictional lines is also constitutional.

Although there is some force to the defendants' argument, *Beatham* is distinguishable from the instant case. First, the court rejects the defendants' contention that a prisoner transferred to Whiting passes completely from the jurisdiction of either the Department of Correction or the particular institution from which he was transferred. As noted above, the transferring institution continues to maintain the time records of the inmate, all appeals to the Pardons Board must be routed through that institution, and, should the transferee regain his "reason" before the expiration of his prison term, he will be transferred back to the particular institution from which he was transferred. In addition, transferees remain under the initial mittimus committing them to the Commissioner of Correction, remain eligible for parole and to a certain extent remain under the watchful eye of the Director of Psychiatric Services of the Department of Correction. In light of all these continuing connections, it hardly seems reasonable to treat such a transfer as interjurisdictional. Although Whiting is formally under the jurisdiction of the Department of Mental Health, it functions in substance as an adjunct of the Department of Correction in treating transferred inmates.

The issue thus resolves down to whether or not the latitude afforded the state and recognized in *Beatham* permits the discrimination involved here when Whiting is treated as a functional part of the correctional system. To a considerable extent, this court's ruling in that case hinged upon a finding that Enfield provided a more desirable penal environment than Somers. That difference in environments could justify the pay discrimination encountered by transferred inmates.

The situation in this case is quite different. The relevant institutional comparison in this case is between Whiting and the institutional or private hospitals where inmates are treated for physical ailments. There is no reason to believe that the environment at Whiting is preferable to that encountered at the hospitals in which inmates are treated for physical illness. Indeed, the opposite is probably true. As recognized by Judge Newman in Chesney v. Adams, *supra,* in

holding unconstitutional the commitment procedures of Conn.Gen.Stat.Ann. § 17–194a:

"The deprivations and hardships suffered by prisoners committed to the Security Treatment Center pursuant to § 17–194a are substantially similar to those involved in [United States ex rel. Schuster v. Herold, 410 F.2d 1071 (2d Cir.), *cert. denied* 396 ·U.S. 847, 90 S.Ct. 81, 24 L.Ed.2d 96 (1969)] and [Matthews v. Hardy, 137 U.S.App.D.C. 39, 420 F.2d 607 (1969), *cert. denied* 397 U.S. 1010, 90 S.Ct. 1231, 25 L.Ed.2d 423 (1970)]. While the two periods of plaintiff's confinement at the Center turned out to be relatively brief, some seventy-four days and ten days respectively, the stigma of his commitment will follow him nonetheless. . . .

". . .

"Formally branded as mentally ill and confined among others actually suffering mental illness, prisoners committed to the Center are 'exposed to physical, emotional and general mental agony' that may well lead 'a man to question his own sanity and in the end to succumb to some mental aberration.' United Sates ex rel. Schuster v. Herold, *supra,* 410 F.2d at 1078." 377 F.Supp. at 893–894.

*See* In re Ballay, 157 U.S.App.D.C. 59, 482 F.2d 648, 668–669 (1973); Lessard v. Schmidt, 349 F.Supp. 1078, 1094 (E. D.Wis.1972), vacated on other grounds, 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974); *cf.* Dale v. Hahn, 440 F.2d 633 (2d Cir. 1971); McAuliffe v. Carlson, *supra,* 377 F.Supp. at 905

Nor are the defendants helped by the holding in *Beatham* that budgetary considerations provided a rational basis for the discrimination involved in that case. *Beatham* only held that it was unnecessary to increase the budget for the pay-incentive program to remedy the ·pay discrimination which was by itself be-

nign. As quoted above, it was held that "[i]t rationally serves the purpose of the compensation program while accommodating budgetary considerations" to establish the form of pay scale system challenged in that case. 369 F.Supp. at 789. It is quite clear that this was not a holding that budgetary considerations alone could justify discriminatory treatment which was otherwise not rationally related to an articulated statutory purpose. *Cf.* Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). As the discrimination involved here does not rationally further the articulated purpose of Conn.Gen.Stat.Ann. § 18–85, the invocation of budgetary considerations does not help the defendants.[4]

■ Thus, the provision of "hospital pay" to inmates receiving treatment for physical illness at institutional or private outside hospitals while denying it to inmates receiving treatment for mental illness at the Whiting Forensic Institute constitutes a violation of the equal protection clause of the fourteenth · amendment.

Accordingly, the defendants are permanently enjoined from denying compensation to inmates transferred from Connecticut Correctional Institutions to the Whiting Forensic Institute at the same hospital pay rates provided to inmates in Connecticut Correctional Institution hospitals and noninstitution hospitals.

■ The plaintiffs also seek the award of back pay with interest for the period of time during which they have been receiving treatment at Whiting. This court is barred from awarding such relief by Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Nor is there any basis for an award of $10,000 in damages which the plaintiffs seek.

So ordered.

4. In view of this holding, it is unnecessary to consider whether discrimination against the mentally ill, an historically disadvantaged group, is inherently suspect, thereby triggering a stricter standard of judicial scrutiny. For a view that stricter scrutiny is required, see Note, Mental Illness: A Suspect Classification, 83 Yale L.J. 1237 (1974).